61    265
f75   687

W. T. YOE v. C. B. HOFFMAN.
J. S. McDOWELL v. J. N. LIMBOCKER.

Nos. 11,611, 11,612.*  (59 Pac. 351.)

1. OFFICE AND OFFICERS—*Misconduct—Investigating Committee.*  The investigation by a committee appointed by the governor, lieutenant-governor, and speaker of the house of representatives, concerning the official conduct of any officer in charge of or connected with any charitable, educational or penal institution, under chapter 239, Laws of 1889 (Gen. Stat. 1897, ch. 6, §§ 33–35; Gen. Stat. 1899, §§ 6362–6364), must be confined to the charges brought to the attention of the governor.

2. ——— *Wrongful Intent Unnecessary.*  To justify the removal of an officer whose official conduct has been so investigated, wrongful intent or fraud on his part need not be shown.

3. ——— *Findings of Committee.*  Findings made by the committee in writing, and signed by four out of five members thereof before being transmitted to the governor, is a sufficient compliance with section 3 of the act requiring that the truth or falsity of the charges shall be determined by a majority vote.

4. ——— *Transmission of Testimony.*  The action of the governor being based on the report of the committee, its failure to transmit to him the testimony in the case except in the form of stenographer's notes, being a mere irregularity, will not invalidate the proceedings.

*For opinion by court of appeals, see 9 Kan. App. —, 58 Pac. 802.—REP.

Yoe v. Hoffman.

5. ——— *Regents Dismissed—Findings Sufficient.* The findings examined, and held sufficient to support the action of the governor in ordering the dismissal of the defendants in error from office.

Error from court of appeals, northern department; JOHN H. MAHAN, ABIJAH WELLS, and SAM'L W. McELROY, judges. Opinion filed December 9, 1899. Reversed.

STATEMENT.

THESE are proceedings in error instituted to reverse judgments of the court of appeals, northern department, by which the plaintiffs in error, W. T. Yoe and J. S. McDowell, were ousted from their offices as members of the board of regents of the Kansas State Agricultural College. The facts necessary to be considered are as follows :

On the 29th day of March, 1899, an affidavit was filed with the governor, as follows :

"The state of Kansas, county of Riley, ss. :

"H. A. Perkins, of lawful age, being by me first duly sworn, deposes and says : That he is a resident of Riley county, in the state of Kansas ; that the Kansas State Agricultural College is located at Manhattan ; that John N. Limbocker and C. B. Hoffman are regents of the Kansas State Agricultural College, and have been such regents since January, 1897 ; that the said John N. Limbocker and C. B. Hoffman, while acting as regents of the said Kansas State Agricultural College, have violated the law governing said body in this, to wit : That the said John N. Limbocker has drawn from the treasury as payment for his said services the sum of fifteen dollars per month for services in providing meals for the students at the college ; that said service is not within the act making provision for the payment of the said regents, and said sum has been drawn unlawfully and wrongfully by the said Limbocker, all of which the said Limbocker well knew ; that the said C. B. Hoffman, regent as

aforesaid, and while acting in such a capacity, aided and abetted the said John N. Limbocker in drawing said sum of fifteen dollars per month for his alleged services in conducting a place where students and others were fed at the said college; that the said John N. Limbocker is the president of the board of regents of the said college, and C. B. Hoffman its treasurer, and were at the time of drawing the said sums from the treasury; that the said J. N. Limbocker and C. B. Hoffman, while acting as regents of the Kansas State Agricultural College, and during the month of June, 1897, did with others transact business of vital importance to the said college without a quorum, secretly and unlawfully in this: That they hired teachers, fixed their salaries, made appropriations and did and transacted such other business as came before them without at any time having a quorum to transact business, all in violation of law, and with the full intent and purpose of overriding and thwarting the will of the majority of the members of the board who prior to that time had been present; that said action was in violation of law; that said meetings so held and for the purpose aforesaid were held, or preliminary meetings were held at the hotel in Manhattan and afterwards were entered upon the books of the college; that the records of the said college were so kept by the secretary, Thos. E. Will, who is also president of the college, and a subservient tool of the said Hoffman and Limbocker, that they purport to show on their face that the said meetings were legal and lawful and that a full quorum was present, whereas, in truth and in fact, no such quorum was present, and by this means the said members of the board have falsified the records. And further affiant saith not.

H. A. Perkins.''

"H. A. Perkins, of lawful age, being duly sworn, says that the matter and statements set out in the foregoing affidavit are true in substance and in fact, as he verily believes.      H. A. Perkins.

"Sworn to before me and subscribed in my presence this —— day of March, 1899.    John Clark Hessin,
<i>Notary Public.</i>"

Thereupon the governor issued his order suspending the defendants in error, Hoffman and Limbocker, as members of the board of regents, and the governor, lieutenant-governor and the speaker of the house of representatives selected a committee of two senators and three representatives to inquire into the truth of said charges and make report as provided by law. The committee, having organized, sent to each of the defendants in error a notice in writing, as follows:

"DEAR SIR: I am instructed to inform you that the motion '*to make more definite and certain*' the complaint of H. A. Perkins against J. N. Limbocker and C. B. Hoffman, has been overruled, that permission to file an 'Amended Complaint' has been granted H. A. Perkins, the same to be filed by *six p. m., Friday, April 14, 1899*, that defendants be given till *6 p. m., Monday, April 17, 1899*, in which to file their answer thereto, and that the further hearing, under said amended complaint will be held at *Manhattan, Kan., Wednesday, April 19, 1899, at two o'clock p. m.* T. J. Hudson, Esq., at Fredonia, Kan., has been notified as above.     Respectfully,
                    C. P. BOLMAR, *Court Clerk.*
"By order of 'the committee appointed by the governor, lieutenant-governor, and speaker of the house of representatives to investigate charges against C. B. Hoffman and J. N. Limbocker, regents, etc.'"

While the first affidavit contained two charges of misconduct against the defendants in error, the amended affidavit contained eight, and included the charges made in the original affidavit. The amended affidavit was never presented to the governor. Defendants in error objected to proceeding with the investigation under the amended charges and asked that the same be stricken from the files, and that the committee refuse to consider the same, which objection was overruled. After hearing the testimony, the committee

returned to the governor certain findings, signed by four of their number. Those necessary to be considered are set out in the opinion.

On the 5th day of May, 1899, the governor sent to each of the defendants in error a notice of removal, as follows :

"EXECUTIVE DEPARTMENT, STATE OF KANSAS.

"*In the matter of the charges against* JOHN N. LIMBOCKER *and* C. B. HOFFMAN, *Regents of the Kansas State Agricultural College.*

NOTICE OF REMOVAL.

" IN pursuance of law and the findings and report of the committee heretofore appointed to investigate charges in writing made against you by H. A. Perkins, filed in this office on the 29th day of March, A. D. 1899, calling in question your official conduct as one of the regents of the Kansas State Agricultural College, you are hereby discharged and dismissed from further service as a member of the board of regents of the said Kansas State Agricultural College.

Dated at Topeka, Kansas, this fifth day of May, A. D. 1899.        W. E. STANLEY, *Governor.*"

Upon the same day the governor appointed W. T. Yoe and J. S. McDowell to fill the vacancies thus caused in said board of regents.

*A. A. Godard*, attorney-general, and *J. S. West*, for plaintiffs in error.

*Clemens & Meily*, for defendants in error.

The opinion of the court was delivered by

SMITH, J. : The proceedings by virtue of which the defendants in error were removed were instituted under chapter 239, Laws of 1889. (Gen. Stat. 1897, ch. 6, §§ 33–35; Gen. Stat. 1899, §§ 6362–6364.)

The action of the committee in permitting amended charges to be presented against the defendants in error without the same having been brought to the atten-

1. Investigation confined to charges filed with governor. tion of the governor, and proceeding thereunder to investigate the charges made in the same, we do not think was justified under the law. Section 1 of the act requires that the governor shall determine whether the charges are to be deemed worthy of credit, and whether they emanate from a reliable and trustworthy source. He cannot suspend an officer until he has passed upon the credit and reliability of the charges made. This position is fortified by the language used in section 3 of the act, requiring the governor either to dismiss or reinstate the officer " named in the complaint," according to the findings and report of the committee.

The amended charges never having been brought to his attention, we think the committee was without jurisdiction to consider the same or act thereon. The governor acted under the affidavit filed is his office on the 29th day of March, 1899, and the investigating committee was appointed in pursuance thereof; and it is but fair to the persons whose conduct was under investigation to confine the inquiry to the charges which moved the governor to act in causing the committee to be appointed and the officers removed during the investigation. To permit an investigation to proceed upon a complaint not brought to the attention of the governor would result in a trial being had upon charges which the executive might not deem trustworthy or entitled to credit. Mr. Justice Johnston, however, does not concur in this view, and is of the opinion that the committee had full jurisdiction to pass upon all the charges contained in the amended complaint.

The original affidavit accused the defendant in error Limbocker with having drawn from the treasury the sum of fifteen dollars per month for providing meals to

the students at the college; that such service was not within the act making provision for the payment of said regents, and was unlawfully and wrongfully drawn, all of which said Limbocker well knew; that C. B. Hoffman, while acting as regent, aided and abetted said Limbocker in drawing said sum of fifteen dollars per month for his alleged service in conducting a place where students and others were fed at the college; and further, that Limbocker and Hoffman, while acting as regents of the Kansas State Agricultural College, during the month of July, 1897, did, with others, transact business of vital importance to the college without a quorum, which was secret and unlawful in this, that they hired teachers, fixed salaries, made appropriations, and transacted such other business as came before them, without at any time having a quorum to transact business, all in violation of law, and with the full intent and purpose of overriding and thwarting the will of the majority of the members of the board who, prior to that time, had been present. The findings of the committee on these two charges are as follows:

" FINDINGS.

"*First charge.* We find that John N. Limbocker and C. B. Hoffman were, at and during the time complained of in said charge, regents of the Kansas State Agricultural College, and that John N. Limbocker was the president of said board of regents, and the said C. B. Hoffman was treasurer.

"A revolving fund of $300 was appropriated and set aside by Regent and Treasurer Hoffman, and placed to the credit of John N. Limbocker in the Dickinson County Bank, for the purpose of maintaining a dining-hall where meals were to be furnished to students, members of the faculty and other persons visiting said college, at such prices and on such terms as provided by the board of regents.

"We further find, that by order of the board of regents the sum of $250 was set apart for the use and benefit of the department of domestic science, and that a part of said sum, the exact amount of which your committee is unable to state because of the indefinite and uncertain data furnished upon that point, was expended in the purchase of furnishings and materials for the operation of said dining-hall.

"We further find, that Regent John N. Limbocker was by the said board of regents of which he was a member engaged and employed as the purchasing agent for said dining-hall at the salary of fifteen dollars per month; that pursuant to said employment, and while acting as a regent of said college, he entered upon the discharge of the duties as such purchasing agent, on or about the 1st of September, 1898, and continued to so act until the date of his suspension, which occurred on the 29th day of March, 1899.

"We further find, that the treasurer of said college paid to said John N. Limbocker, for services aforesaid, the sum of $105.

"*Second charge.* We find that the meetings alleged to have been held on the 2d, 3d, 5th and 6th days of July, 1897, were held without any quorum being present at any of said meetings, and that teachers were hired, salaries were fixed, appropriations of money were made and a vast amount of other business was transacted during said time; that at no time during the July meeting after the first day of said month was there a quorum present, and that only three regents, to wit, Hudson, Hoffman, and Limbocker, were present.

"We further find, that among other matters of business that were transacted during the month of July, and when no quorum was present, a manifesto was issued and published setting forth various reasons for change in the management of the college, and that said manifesto purported to be the act of all the board of regents of said college, when in fact and in truth the only regents present and giving sanction to said

manifesto were Regents Hoffman, Hudson and Limbocker.

"That the minutes of said meeting held on the 2d day of July, 1897, recite that the 'board met,' when in fact and in truth only three members of the board met; that there was no recitation in the minutes of said meeting held on the 2d day of July, 1897, that showed that no quorum was present, but the minutes of July 3, 5 and 6 show that no quorum was present and no business transacted except to adjourn.

"We further find, that at the September, 1897, meeting of the said board of regents a resolution was passed approving the minutes of the said meeting as held on June 30 and ending July 6, inclusive, and alleging that each and every part thereof was adopted and made a part of the regular action of the board of said meeting, and thereby declaring the same to be fully ratified and confirmed as done at said July meeting.

"We further find, that during the interim between July and September Regent Kelley died and Mr. G. M. Munger was appointed in his place, and attended and participated in said September meeting, and the votes in favor of said ratification were cast by Hoffman, Hudson, Limbocker and Munger. But there was no correction of the minutes of said July meeting to show that no quorum was present."

The finding that regent Limbocker was employed by the board as purchasing agent for the students' dining-hall, at a salary of fifteen dollars per month, during the time he was performing his legal duties as regent, and that he was paid by the treasurer of the college $105 for services as such purchasing agent, brings his acts within the prohibition of section 400 of chapter 100 of the General Statutes of 1897 (Gen. Stat. 1899, § 2317), which reads:

"All officers, state and county, and all officers appointed or elected for the purpose of overseeing and directing any of the public improvements of the state,

and all officers holding and exercising any office of trust or profit under and by virtue of any law of the state, are hereby prohibited from taking any contract, or performing or doing or of having performed or done, for their own profit, any work in and about the office holden by them, or in or about any work over which they have in whole or in part the supervision, direction or control, and from furnishing any materials used in any such work, and from furnishing for the use of any institution, public work, county, township or other interest, the protection of which interest is a part of the duties of his office, any firewood, clothing, materials for building, or other thing required by such institution, public work, county, township or other interest so in the keeping, in whole or in part, of such person."

Limbocker profited to the extent of fifteen dollars per month by doing work in and about the office of regent held by him.   He did work for the college for a compensation, under contract with the board of regents, in a matter over which he had, as one of the regents, in whole or in part, direction or control.   It matters not that the regents, under the law, are given general supervision of the college and the direction and control of all expenditures. (Gen. Stat. 1897, ch. 57, § 9; Gen. Stat. 1899, § 6541.)   They cannot, in the exercise of such authority, employ one of their number to do any work in or about the office held by him, or over which he has any supervision.   The purpose of the law is to remove a regent from all temptation.   Section 7, chapter 57, General Statutes of 1897 (Gen. Stat. 1899, § 6530), reads : "No one connected with the college as professor, tutor, teachers or employee, shall be a regent."

Counsel for defendants in error contend that mere errors of judgment on the part of the regents, or negli-

2. Proof of
wrongful intent
unnecessary.
gence attributable to a misconception of duty, without fraud, is insufficient to authorize a removal. We do not so understand the statute. The case of *State v. Hastings*, 37 Neb. 96, 55 N. W. 774, cited by counsel, is not applicable. That proceeding was an impeachment, authorized by the constitution of Nebraska to be tried before the supreme court. The court held that the proceeding was to be regarded as a criminal prosecution in which the *quantum* of proof to warrant a conviction must show guilt beyond a reasonable doubt. The court in deciding that case used this language : "It should be remembered in the first place that this is a criminal prosecution and we are not to enter upon the field of conjecture in search of a theory upon which the respondents may be pronounced guilty."

So, in the case of *Triplett v. Munter*, 50 Cal. 644, which was a trial upon an information charging the receipt of illegal fees, the court held that the statute under which the respondent was sought to be removed from office was highly penal in its nature. In *McMaster v. Herald*, 56 Kan. 231, 42 Pac. 697, the court quoted approvingly from *Lynch v. Chase*, 55 Kan. 367, 368, 40 Pac. 669, as follows :

"In a summary proceeding for the removal of officers under the statute the same formality and precision are not required as in a trial before a court, and the accused cannot claim the benefits, incidents and common-law rights pertaining to such a trial."

Again, in *Lynch v. Chase*, supra, in commenting on the nature of proceedings under this statute, the court said :

"As the committee does not constitute a court, and as the incidents and common-law rights of a court trial are not required, the objections made in regard to

certain informalities and irregularities are unavailing.
. . . The evidence was heard and considered by a
tribunal created for that purpose, and the duty of de-
termining its sufficiency belongs to that tribunal, and
not to the court. Testimony was offered to sustain
and refute the charges, and the weight and sufficiency
of that testimony, as well as the fact of whether cause
was shown, were concluded by the determination of
the committee and the action of the governor.''

In criminal prosecutions, where the statute contains
nothing requiring acts to be done knowingly, and the
acts done are not *malum in se*, or infamous, but are
merely prohibited, the offender is bound to know the
law, and a criminal intent need not be proved. (*The
State v. Bush*, 45 Kan. 138, 25 Pac. 614.)   In *Falloon
v. Clark*, ante, p. 121, 58 Pac. 990, 992, it is said :

''The only ground of removal by impeachment is
'misdemeanor in office,' and these words, we think,
are used in a parliamentary sense, and mean miscon-
duct in office. It is something which amounts to a
breach of the conditions tacitly annexed to the office,
and includes any wrongful official act or omission to
perform an official duty.'' (See, also, *State v. Leach*, 60
Me. 58 ; *Rogers v. Morrill*, 55 Kan. 737, 42 Pac. 355.)

It is contended that, while the committee finds that
Limbocker was paid fifteen dollars monthly by the
treasurer of the board of regents, there is no finding to
show out of what fund he was paid.   The report con-
tains the following :

'' We further find, that Regent John N. Limbocker
was by said board of regents, of which he was a mem-
ber, engaged and employed as the purchasing agent
for said dining-hall at the salary of fifteen dollars per
month. . . . We further find that the treasurer
of said college paid to said John N. Limbocker for serv-
ices aforesaid the sum of $105.''

The additional finding is made that the regents set

aside for the use and benefit of the department of domestic science the sum of $250, and that a part of that sum was expended in the purchase of furnishings and materials for the operation of said dininghall. It would be a forced and unnatual deduction to conclude that the money paid to Limbocker by the treasurer was not appropriated out of the funds of the college.

The second finding, that meetings were held on July 2, 3, 5, and 6, 1897, by three regents only, viz., Hudson, Hoffman, and Limbocker, and that teachers were hired, salaries fixed, and appropriations of money made, and a vast amount of other business transacted, shows misconduct of the clearest kind. Seven regents constitute the board, and a majority constitute a quorum. (Gen. Stat. 1897, ch. 57, §§ 5, 8; Gen. Stat. 1899, §§ 6529, 6532.) While it is true that in September, 1897, at a meeting of the board, the minutes of the said meetings, as held on June 30 and ending July 6, inclusive, were ratified and confirmed, the ratification was done, however, by four members, one of whom (Munger) was not a regent at the time the July meetings were held, but was appointed afterward to fill a vacancy.

In the minutes of the meeting held by Hudson, Limbocker and Hoffman on July 2, there was no recital that a quorum was not present. This was one of the meetings at which the committee found that a vast amount of business was transacted, such as hiring teachers, fixing salaries, etc. While but three members were present and acted, the minutes were so written as to carry the presumption that a legal quorum participated. The attempt subsequently to ratify the acts of a minority of the board could have no reference to the meeting of July 2, for there was

no showing on the records of the board that any action done at that meeting needed ratification. There was nothing indicating that a majority was not present.

Complaint is made that the committee violated section 3 of the act authorizing the investigation, which

3. Signatures of members to findings sufficient.

provides: "Having concluded their investigation the committee shall, under the evidence and by a majority vote of the whole number of the committee, determine the truth or falsity of the charges." The record of their proceedings shows no vote on the truth or falsity of the charges. Nine separate findings, however, were made in writing, designated as findings in the matter, and returned to the governor. These were signed by all the committee except one. A vote is an indication of the opinion of one individual among many when making a choice. The recital of a formal vote by the members of the committee on the charges would have been no more certain evidence of their assent and concurrence in the truth of the charges than the return of the findings to the governor, duly signed.

Again, it is insisted that the committee being required "to make a complete report of their findings

4. Transmission of testimony immaterial.

and transmit the testimony in the case to the governor," a filing with him of the stenographic notes of the testimony is insufficient. We do not regard this omission as more than an irregularity, nowise affecting the validity of the findings or impairing the duty of the governor to act thereon. The findings govern the action of the executive. The law reads: "The governor shall thereupon either dismiss from the public service or reinstate the officer or officers named in the complaint, according to the findings and report of the

committee.'' This proceeding was. a summary one, the same precision and accuracy not being required as in a trial before a court. (*Lynch v. Chase*, supra.)

The findings show sufficient grounds for the removal of the defendants in error from their offices as regents. The judgments of the court of appeals will be reversed and the orders of ouster entered by that court against the plaintiffs in error vacated and set aside, with directions to proceed further in accordance with this opinion.

JOHNSTON, J., concurring.

DOSTER, C. J. (dissenting): I dissent from the judgment of the majority of the court. I dissent for two reasons: (1) Because it does not appear from the report of the legislative committee to the governor that the contract taken by Regent Limbocker to superintend the college dining-hall and the work performed by him under such contract was for a ''profit'' over and above the amount to which he was entitled as compensation for his services as a regent; (2) because the committee did not state in their report, or find any facts equivalent to a statement, that the taking of the contract, the doing of the work or the acceptance of the compensation for it, even if in the form of a profit beyond the compensation allowed by law, were done with a wrongful intent; and, likewise, because the committee did not state or report any facts equivalent to a statement that the records of the. meetings of the board of regents were incorrectly kept with any wrong intent. The statute for the violation of which Limbocker was removed from office is quoted in the opinion of my associates. It is an act of 1867 (ch. 132), and is entitled ''An act to restrain state and county officers from speculating in their offices.'' It

will be observed that the act is directed against the speculation by officers in their offices, and it prohibits officers from taking contracts or doing work in or about their offices for profit, or from having such work performed for them for their profit by others. Of course, all officers are allowed profits from the work of the offices filled by them. These profits, however, are in the form of fees or salaries, ordinarily, fixed and defined in amount. The statute does not mean to prohibit the taking of contracts or the doing of work by officers in and about their offices by which their legal compensation may be earned, but it means to prohibit the taking of contracts or the doing of work by them over and beyond the required duties of their offices, and for a compensation which the law does not allow to them because the work performed does not pertain legitimately to the duties of their offices.

The compensation of the board of regents of the state agricultural college is not fixed in the form of fees and salaries, as in the case of most of the public officers of the state. It is provided for by annual appropriations, which are made to cover "salary, *per diem*, mileage and expenses," and for the two fiscal years beginning July 1, 1897, and ending June 30, 1899, was fixed at fourteen hundred dollars per annum. (Laws 1897, ch. 133.) This appropriation act uses the words "salary and *per diem*," but neither it nor any other act declares what such salary or such *per diem* shall be. The words are therefore used merely in the sense of "compensation." The members of the board of regents are not continually engaged in the performance of the duties of their positions, but they perform them as the exigencies of the institution require, and at such times, covering such periods of days, as they may judge necessary. They

reside at the site of the institution or at distances more or less remote from it. Consequently, in attending the sessions, the different members spend varying periods of time and incur varying amounts of expense. The fund annually appropriated is therefore equitably distributed by them among themselves to cover the differing periods of time employed and varying amounts of expense incurred by them. This distribution of the fund is made by themselves, and what particular portion of the fund each particular member may receive is a matter of concern to no one but themselves and is unknown to any one but themselves. So long as they keep within the limits of the appropriation, and so long as they do not devote any portion of it to a purpose forbidden by law, their distribution of it among themselves is a matter of absolute indifference to others.

Furthermore, it should be stated that the amount to which each member becomes entitled is not drawn directly by him from the state treasury, but the aggregate amount due all the members is drawn for them by the treasurer of the college upon his own voucher and is distributed by him to his fellow members. Such being the case, it is absolutely impossible to tell from the report of the legislative committee to the governor whether the sum of fifteen dollars per month, for which Regent Limbocker contracted to serve as purchasing agent of the college dining-hall, and which the treasurer of the college paid him, was paid as "salary" or "*per diem*" to which as regent he was entitled, or whether it was paid him as a monthly compensation over and above his usual salary or *per diem*. In either of these cases it would be a legitimate payment, provided it and all other payments to all the regents on account of salary, *per diem*,

mileage and expenses did not exceed the annual ap-
propriation of $1400. It is not found by the commit-
tee that such appropriation was in excess of the annu ¹
appropriation for "salary, *per diem*, mileage and ex-
penses." It is not found by the committee that it was
paid out of another fund than the fund appropriated
for such purposes. It is simply found that a payment
of fifteen dollars per month was made for the services
stated. It cannot be that a mere finding that an
official drew money from the public treasury is a finding
that he drew it illegally, when there are two or more
funds out of which it may have been drawn and from
one of which it was legal to draw it. The report of
the committee amounts to nothing more than a find-
ing that the money was drawn, but, for aught the re-
port or findings show, it may have been rightfully
drawn out of the annual appropriation for the regents'
compensation. The charge was that the service per-
formed by Limbocker "was not within the act making
provision for the payment of the regents," and that
the sum paid therefor "had been drawn unlawfully
and wrongfully," but there is not a word in the find-
ings, or the report of the committee, which, in that
respect, is responsive to the allegations of the com-
plaint.

But irrespective af the total failure of the report to
convict Limbocker of having performed work pertain-
ing to the duties of his office "for profit," over and
beyond that to which he was entitled out of the an-
nual appropriation of $1400, but assuming, as a con-
cession for argument's sake, that it does show a
performance of work for such profit, it is so lacking
in another respect that no order of removal can be
rightfully predicated upon it. It totally fails to state
that any of the acts charged against either Limbocker

or Hoffman were performed with a wrongful intent. The statute upon which the proceedings for removal are based is chapter 239, Laws of 1889 (Gen. Stat. 1897, ch. 6, § 33; Gen. Stat. 1899, § 6362) :

"Whenever charges shall be made by any person or persons, and circulated within the state or presented by such person or persons in writing to the governor, at any time when the legislature is not in session, and said charges shall be deemed worthy of credit or emanating from a reliable and trustworthy source, whereby the management or administration of the affairs of any charitable, educational or penal institution, or the official conduct of any officer in charge of or otherwise connected with any of said institutions, shall be called into question upon the grounds of corruption, venality, inefficiency, misconduct, immorality, or inattention to duties, an investigation shall be had as provided for in the second section of this act. Notice shall be given in writing to the official in charge of the institution, and also to the officer or each of the officers against whom complaint or charges have been made or preferred ; which said notice shall contain the substance of the matter charged, and may be served upon the parties by any person selected by the governor for that purpose. Immediately following the service of such notice the governor shall relieve from duty the official against whom the charges are pending, which suspension shall continue during the period covered by the investigation."

By this statute the essential elements of the charge, and consequently of the proof to sustain it, are "corruption, venality, inefficiency, misconduct, immorality, or inattention to duties." The general rule applicable to all criminal prosecutions, both as to allegation and proof, is that a wrongful intent must be charged. (*The State v. Eastman*, 60 Kan. 557, 57 Pac. 109.) As to acts *mala prohibita*, that is, not bad in themselves but only bad because forbidden, it is not necessary to

allege or prove a wrongful intent, and as to such class
of cases *The State v. Bush*, 45 Kan. 138, 25 Pac. 114,
is applicable, and as to such cases the intent to com-
mit the interdicted acts, irrespective of any wanton
purpose to do wrong, is the criminal intent.   How-
ever, we do not have to do in this case with a statute
providing for the punishment of an offense *malum
prohibitum*.   The statute above quoted, so far as con-
cerns the charges made against Limbocker and Hoff-
man and said to have been proved against them,
makes a wrongful intent an essential ingredient of the
acts charged.   Those acts are, in one particular, the
taking of a contract and the drawing of money for a
profit aside from that allowed by law as compensation
for the performance of the duties of an office, and, in
another particular, the falsification of official records.
Within which one of the several specified general rea-
sons for the removal of these officers did these acts of
these accused persons fall?   If under the head of
"corruption," then certainly a corrupt intent must
have existed, because corruption is the perversion or
deterioration of moral principles.   It is depravity,
the loss of purity or integrity.   If the acts charged
constitute "venality," then also a wrong intent must
have existed, because venality is the state or char-
acter of being basely or improperly influenced by
sordid money considerations.   The acts charged did
not constitute "immorality," because immorality is
vice, wickedness, lack of purity of personal character
or conduct.   As generally used, and probably as used
in the statute quoted, it means licentiousness of sexual
conduct.   The acts charged did not constitute "in-
efficiency," because inefficiency in a public officer is
the lack of power or capacity properly to discharge
the duties of his position.   Nor can the acts charged

be brought under the head of "inattention to duty." Inattention does not mean lack of capacity to perform a thing; it means neglect of it—lack of effort to do it.

The only remaining ground covering the charges against the accused is misconduct.  No reasonable person will contend that any of these charges can be included under the head of "corruption, venality, immorality, inefficiency, or inattention to duties." If included at all within the statute, it is within the term "misconduct." Misconduct is bad conduct.  That is the shortest and best definition that can be given to the word either in its legal or its popular sense.  It implies culpability—turpitude in a minor degree, at least.  It is a term applied to actions knowingly performed and wrongful in their nature but not necessarily of serious consequence.  It, however, imports knowledge and wrongful intent.  It is not a word descriptive of a character of act performed, but of a quality of mind possessed.  No act, however harmful in its consequences, can be said to be misconduct unless it be performed with a motive more or less bad. The term is not a fit one to describe an act *malum prohibitum*, the wrong intent in which is presumed from the mere doing of the act.  An act *malum prohibitum* is not inherently bad or vicious, but only bad or vicious by fiction of law.  In the light of this universally accepted and obvious meaning. of the word "misconduct," the acts charged against Limbocker and Hoffman were innocent unless performed by them with a wrongful intent.  All the authorities bearing on the subject support the view here taken.

Reference is made in the majority opinion to *State v. Hastings*, 37 Neb. 96, 55 N. W. 774, and it is said not to be applicable to this case because the proceeding there involved was an impeachment author-

ized by the constitution to be tried before the supreme court. The only adverse judgment that could have been pronounced in that case was a judgment of removal from office; so likewise the only adverse judgment that could be pronounced in this case was removal from office. The only reason for removal given in that case was the commission of a "misdemeanor in office"; so likewise the only reason that could be given, or has been given, in this case was "misconduct" in office. I fail to see any substantial difference between "misdemeanor in office" and "misconduct" in office, and I fail to see any difference affecting the moral quality of the acts charged in the fact that the removal in one case was by formal proceedings in what is called "impeachment," before a court already constituted generally for the trial of such cases, and a removal in the other by a judicial tribunal specially organized for the trial of that particular case. The legislative committee in this case was a judicial tribunal. It entertained a complaint, it heard and considered evidence, it found and reported facts. In every essential particular it was a judicial tribunal, and in every essential particular its judgment was one in impeachment of a public officer. The mere fact that in one case the lofty, high-sounding term "impeachment" was used, and in the other it is not, nowise affects the essential. character of the proceedings or the judgment pronounced. The Nebraska case is not thought applicable to the one under consideration because, as said in that case, the prosecution was criminal in its nature. So it was in that case and so it is in this one. It is criminal in the sense that the acts charged and to be proved were criminal offenses. Neither case was criminal in the sense that the ordinary judgment of conviction and

punishment could be pronounced.  The Nebraska court, however, held it to be criminal only in the sense that the *quantum* of proof necessary to conviction should be produced by the state.

It may be admitted that under the previous decisions of this court, cited by the majority in their opinion, the prosecution before a legislative committee of a case for the removal of a public officer is not a criminal prosecution in the sense that guilt must be shown beyond a reasonable doubt, or in the sense of a compliance with the strict rules of criminal procedure upon the trial ; but that is not to say, by any means, that the elements of the offense charged need not be proved by some degree of evidence.  It may be that the element of wrongful intent need only be established by the greater weight of evidence, not to the exclusion of all reasonable doubt ; but to say that such element of wrongful intent need not be proved at all is to fly in the face of all fair-mindedness and common sense.  The case of *State v. Hastings*, supra, is directly in point in its application to this one.  It was there ruled :

"But where such act (the misdemeanor charged) results from a mere error of judgment or omission of duty without the element of fraud, or where the alleged negligence is attributable to a misconception of duty rather than a wilful disregard thereof, it is not impeachable, although it may be highly prejudicial to the interests of the state."

That, in my judgment, is the correct rule of law, and it should have been accepted as such by the legislative committee and by the governor.  In the case of *Triplett v. Munter*, 50 Cal. 644, a justice of the peace was charged with the statutory offense of "charging and collecting illegal fees" and with the neglect or refusal "to perform the official duties of his office."

The penalty consequent upon conviction was removal and the payment of a fine. The statute did not make a wrongful intent an ingredient of the offense. The court, however, held that such intent should have been proved, and it declared that in order to a judgment of conviction "the court must find that such fees were knowingly, wilfully, or corruptly taken."

Returning to the subject of the definition of the word "misconduct," the case of *Turnbull agt. Martin*, 37 How. Pr. 20, is instructive. A statute of New York provided that the report of arbitrators should be set aside if "the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear any evidence, pertinent and material to the controversy, or any other misbehavior, by which the rights of any party shall have been prejudiced." (3 Rev. Stats. N. Y., 1875, 844.) The arbitrators in a certain case violated several of the above provisions, but the court ruled that "the statute by the terms 'misconduct' and 'misbehavior' contemplates acts evincing unfairness or contrary to all the principles of a just proceeding," and that their award would not be disturbed, "without some evidence of fraud, corruption, partiality, or unfairness."

The principle of non-liability of public officers to removal for illegal acts honestly performed was decided by this court in *The State, ex rel., v. Scates*, 43 Kan. 330, 23 Pac. 479. In that case a county commissioner was charged with various official acts illegally and corruptly performed, and *quo warranto* was instituted to remove him from office because thereof. Among the facts charged was the allowance of illegal claims against the county. The court ruled:

"Where a board of county commissioners, upon the

advice of able and competent attorneys at law, allows certain claims which are not strictly legal charges against the county, its official action in so doing will not render the commissioners liable to the charge of corruption, or forfeiture of office, if the allowances were honestly made and the board acted merely upon a mistake or error of law as to the liability of the county.''

This case is precisely in point. The fact that the action of the board of commissioners was upon the advice of attorneys gives no countenance to the idea that if they had not received it the law would have been ruled differently. The advice of attorneys is no shield against the consequences of a corrupt act. The *bona fide* taking of it, however, is evidence of lack of corruption. If evidence showing lack of bad motive in a public official charged with an illegal act may be shown by him in defense, it implies, of course, that the illegal act plus the bad motive must exist to justify his condemnation.

So far as the case against Limbocker under the first charge is concerned, the statute is difficult to understand and construe. Analyzing it as well as can be done, it seems to prohibit officers from taking contracts for their own profit for the doing of work in and about the offices holden by them, or performing or having performed for their own profit any work in and about such offices, or in or about any work over which they have in whole or in part the supervision, direction, or control. The interdicted acts, therefore, are the doing of work for profit and the taking of contracts for profit in and about public offices. Work and contracting to work are one element of the offense and profit is another. What is meant by '' work ''? The statute thus far examined seems to give to that word a broad and general meaning, comprehending probably any and all kinds of labor, manual, mental, or

19—61 KAN.

clerical, but the succeeding clause seems to give it a more limited signification.   After prohibiting the doing of work and contracting for work, it further reads, " and from *furnishing* any *material* used in any *such* work," implying, therefore, that the work prohibited, or prohibited to be contracted for, is that which requires materials of some kind for its prosecution, such as buildings and the like.   I do not say that the statute bears this interpretation.   I only say that its meaning is obscure and difficult to determine, and a layman might very innocently violate it when tested by the rules of statutory construction.

The other finding, to wit, that Limbocker and Hoffman falsified the records of the sessions of the board by reciting that on July 2 " the board met," when in fact a quorum was not present, is of a piece with the other one.   It appears that at a subsequent meeting the action of those who were present on July 2 was ratified by a legal quorum of the board, evidencing thereby that what had been done on the day mentioned had in it no element of wrong or unfairness. Admit that no quorum was present on July 2, but that business of importance was transacted by less than a quorum in the name of the board as an entirety. It may have been so done with a previous understanding with absent members that it should be done and would be thereafter ratified, as actually was the case. There is no statute prohibiting an action by a minority of a board of regents in the name of the whole board if with the understanding by the majority that it may be so done.   The exigencies of the college may have compelled the doing of the work on July 2, and it may have been impossible for a quorum of the regents to attend on that day.   That the action of July 2 was taken without any wrongful intent is manifest from the fact that while the same number of regents

attended on the succeeding 3d, 5th and 6th days of July they did not assume to transact any business. This they might have done as well as on the 2d and made their records show the presence of a quorum, if they had designed to do anything wrong.    There is not a board of regents in this state, or any other state— there is not a body corporate in the land—that does not transact much of its important business through subcommittees and minorities of its membership, and does not likewise do it in the name of the majority, through previous express agreement or an understanding growing out of constant and oftentimes necessary practice.    I insist that, in addition to the fact that a minority of the regents assumed to make their records speak as the action of the majority, it should have been found that the erroneous recital was made with the wrongful intent to defraud the absent majority. This was not found.

These charges are trivial.    They were made and prosecuted, as everybody knows, for the purpose of ousting the officers named and thereby gaining political control of one of the educational institutions of the state.    They were not made and prosecuted for the purpose of advancing the interests of the institution, but were conceived and prosecuted in that spirit of malignant partizanship which is the curse of American politics, and they do but provoke a retaliatory assault when the trembling balance of political majorities in this state shall go the other way.    They were made and prosecuted to subserve the ends of office for politicians and not of education for the youth.    Similar charges and proceedings by the office-seekers of my party shall never have countenance by me, nor will I be deterred from denouncing those made and conducted by political opponents as causeless, wicked, and despicable.