212 So.2d 609 (1968)
J.A. MALONEY, Appellant,
v.
Claude R. KIRK, Jr., Governor of the State of Florida, Appellee.
No. 36803.
Supreme Court of Florida.
July 2, 1968.
Harvie J. Belser, Bonifay, for appellant.
Earl Faircloth, Atty. Gen., T.T. Turnbull and Robert A. Chastain, Asst. Attys. Gen., for appellee.
PER CURIAM.
Affirmed.
THOMAS, J., concurs.
ROBERTS, J., concurs with opinion.
CALDWELL, C.J., and ADAMS, J., concur and agree with ROBERTS, J.
ERVIN, J., concurs with opinion.
DREW, J., dissents with opinion.
THORNAL, J., dissents and agrees with DREW, J.
ROBERTS, Justice (concurring specially):
We here review on direct appeal a judgment of the Circuit Court in and for the Second Judicial Circuit of Florida, Leon County, which declared inoperative under *610 the facts here present § 104.27, Florida Statutes, because of constitutional limitations, and dismissed the complaint. The background, history, questions involved and decision of the trial court are set forth in the opinion of that court in the following language: 
"The plaintiff, J.A. Maloney, a resident and qualified elector of Franklin County, filed a complaint against `Claude R. Kirk, Jr., Governor of the State of Florida,' asserting the right under Section 104.27, Florida Statutes, to test the title of Mr. Kirk to the office of governor. He charged numerous violations of Section 99.161, Florida Statutes, relating to the receipt, handling and disbursement of campaign funds and payment of campaign expenses in the primary and general elections of 1966.
"On August 17, 1967, this Court entered an order dismissing that complaint with the customary leave to amend.
"Plaintiff has now filed a petition for rehearing, a petition for clarification and an amended complaint. A motion to dismiss the amended complaint has been filed. The amended complaint adds little to the case and the petitions for rehearing and for clarification, for the most part, simply take issue with the conclusions heretofore announced by the court.
"However, because of the great importance of the question presented, the Court has permitted a full reargument of the case and has carefully re-examined the authorities.
"Careful analysis of Section 99.161, Florida Statutes, reveals that by far the greater part of the acts thereby forbidden are the acts of persons other than the candidate and, consequently cannot form a foundation for a proceeding against the successful candidate under Section 104.27. Most of the charges against Mr. Kirk fall in that class, or relate to acts not in any manner prescribed by Section 99.161.
"It will be observed that Section 104.27 authorizes penalties against persons other than candidates. Corporate charters, racing permits, and franchises to operate public utilities may be revoked for violations of Section 99.161.
"When subsection 9 of Section 104.27 provides that:
`Any elector having information of any violation of Section 99.161 may file a petition in any circuit court of this state in the county in which the person or persons violating Section 99.161 resides,'
it does not limit such suits to proceedings against successful candidates. In its broadest aspect, Section 99.161 has only a very limited application to acts of candidates themselves.
"However, the complaint does allege facts which, if true, charge Mr. Kirk with some violations of this statute, and, if the statute may be validly applied to him, the complaint must be entertained by the Court.
"Section 99.161 relates exclusively to campaign funds of candidates for public office. It forbids certain persons making contributions to candidates. It fixes the maximum that any person may contribute. It regulates in great detail the manner and time of receiving, reporting and disbursing these funds. It does not limit or regulate the purposes of expenditures of these funds except that it forbids expenditures for advertising in certain publications; it forbids certain expenditures in behalf of a person before he becomes a candidate; it prohibits a candidate paying for the privilege of speaking at a political meeting and forbids candidates paying for political polls not under their control.
"In the case at bar no charge is made of any expenditure of funds for an illegal purpose as distinguished from alleged failures to follow the letter of the statute in the mechanical process of paying campaign expenses.
*611 "The complaint does allege numerous instances in which, it is charged, this statute was not complied with.
"Section 104.27 provides, in part:
`(2) The nomination or election to office of any person who wilfully violates the provisions of § 99.161, or cause to violate, may be declared void by the court of competent jurisdiction in which event the nomination for office shall be held as in other cases where a vacancy occurs.
`* * *
`(9) Any elector having information of any violation of § 99.161 may file a petition in any circuit court of this state in the county in which the person or persons violating said § 99.161 resides * * *
`The final decree entered by the court in each case shall make a finding of fact that § 99.161 was or was not violated, as the case may be. If the decree of the circuit court finds as a fact that § 99.161 was violated by any nominee * * * the officer responsible for issuing the certificate of nomination or office * * * shall immediately revoke the certificate of nomination or office as may have been issued, or in case such certificate has not been issued he shall withhold the same.'
"It will be observed that Section 104.27 does not authorize a decree voiding an election for violation of any statute except Section 99.161.
"It is elementary that the legislature may enact any statute not forbidden by the state or federal Constitution. But necessarily implied prohibitions are as binding as those expressed in specific language.
"Article VI of the Constitution declares who are qualified electors of the state.
"Section 3, Article IV of the Constitution, fixes affirmative qualifications which are prerequisites to the holding of the office of governor[1], and Section 5, Article VI specifies disqualifications which prohibit certain persons from holding that office.[2]
"Section 2, Article IV, provides that `the governor shall be elected by the qualified electors of the state.' Section 6, Article VI, requires that `in all elections by the people, the vote shall be by ballot.' And Section 9, Article VI directs that `The legislature shall enact such laws as will preserve the purity of the ballot.' Section 26, Article III, is as follows: `Laws shall be passed regulating elections, and prohibiting under adequate penalties, all undue influence thereon from power, bribery, tumult or other improper practices.'
"It will be observed that the Constitution, in implementing that basic principle stated in Section 2 of the Declaration of Rights that `all political power is inherent in the people' has very carefully outlined who may vote, and who may be elected to *612 the office of governor. Within these limits, the legislature is charged with the responsibility of regulating the election processes so as to protect the political rights of the people.
"But the legislature could not enact a law denying the franchise to holders of racing permits,[3] or liquor licenses,[3] to railroad officials,[3] or to utility operators[3] on the theory that this would tend to `preserve the purity of the ballot,' or prohibit `undue influence' upon elections `from power, bribery, tumult or other improper practices.' The reason is simple. The Constitution has specified who are qualified electors and thus entitled to vote and the legislature may not deny the franchise to any person to whom it is guaranteed by the Constitution even though the legislature might feel that some classes of persons might abuse the privilege of voting.
"The right of the people to choose their chief executive which is guaranteed by the Constitution vests in the people the right to choose for that office any one of those persons possessing the positive qualifications specified in the Constitution and not disqualified for any of the reasons therein stated. At the same time, it guarantees to every citizen possessing the qualifications, and not subject to any of the disqualifications, established in the Constitution the right to aspire to the office of governor, and if elected, to serve; subject, of course, to the power of impeachment and removal. The legislature may no more deny these rights under the guise of preserving the purity of elections than it may deny the franchise to persons qualified under the Constitution who it might decide would exercise an evil influence in political life.
"When the Constitution has dealt with a subject in such manner as to clearly indicate that it was the intent of the authors that the coverage be complete, the legislature is, by implication, denied the power to take from or to add to the constitutional provisions. This rule is particularly applicable to a specification of who may and who may not serve as governor if duly chosen by the people.
"There was a time when the Constitution forbade a bank officer being elected governor[4] and forbade a minister of the gospel serving in the legislature or as governor.[5] These prohibitions were clearly expressed in the Constitution. They were later removed by vote of the people, other qualifications and disqualifications being retained. This action of the people constituted a determination that persons following these callings should not, for that reason, be excluded from these public offices. The legislature obviously could not override this determination by the people and, by statute, reinstate these disqualifications.
"The Supreme Court of Florida in the case of Thomas v. State, 58 So.2d 173 [34 A.L.R. 140], discussed in great detail the power of the legislature to fix qualifications of constitutional officers in addition to those prescribed in the Constitution and announced its conclusions in this language, at page 183:
`Our State Constitution, as we have pointed out, prescribes in no uncertain terms that certain persons are disqualified to hold certain constitutional offices, such as, Governor, Members of the Legislature, Justices of the Supreme Court, Judges of the Circuit and Criminal Courts. As to all officers the Constitution further excludes from office all persons "convicted of bribery, perjury, larceny or of infamous crime, or who shall make, or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter *613 fight a duel or send or accept a challenge to fight, or that shall be second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law." This solemn declaration in our Constitution about qualifications or disqualifications to hold public office are conclusive of the whole matter whether in the affirmative or in the negative form.'
"The plaintiff urges that the statute under consideration does not fix qualifications of candidates for governor, but that it renders invalid a purported election of one who has violated the statute. Under this theory the election is nullified by the act of the candidate and there is a vacancy in the office due to the absence of a lawful election rather than a disqualification of the person elected.
"There are two reasons why this argument cannot be accepted in this case.
"FIRST. The legislature may not do indirectly that which it cannot do directly. To declare an election void and forbid the successful candidate from occupying public office because of conduct which does not go to the freedom of the ballot and the correctness of the counting of the votes and which is not reasonably calculated to have unduly and improperly influenced the voting to such an extent as to prevent the election being a true expression of the popular will is an invasion of the rights of the electorate as well as the successful candidate. It in effect disqualifies the candidate from holding the office notwithstanding the election. This the legislature may not do for the reasons set forth in the cited case.
"SECOND. The purpose of Section 104.27, Florida Statutes, is to exclude from office persons who have subjected themselves to possible improper influences rather than to preserve the purity of the ballot.
"This is apparent when the election code as a whole is considered. The Constitution directs the legislature to enact laws `regulating elections, and prohibiting under adequate penalties all undue influence thereon from power, bribery, tumult or other improper practices.' Pursuant to this mandate the legislature has enacted many statutes.
"Section 104.11, Florida Statutes, defines as a felony the corrupt making of a false affidavit in connection with the election processes. It does not avoid the election of a candidate guilty of this offense.
"Section 104.012, Florida Statutes, provides for the criminal punishment of persons guilty of paying another to register. It does not avoid the election of a candidate guilty of this offense.
"Section 104.061, Florida Statutes, forbids under criminal penalties the use of `bribery, menace, threat or other corruption whatsoever,' to curtail the free exercise of the franchise by qualified electors. It does not void the election of a candidate guilty of one or all these offenses.
"Other illustrations could be given, but these demonstrate that the greatest possible abuses of the election processes  those which tend most strongly to impair the purity of the ballot  do not, under the statute, render the election void even though committed by the successful candidate. Yet the most insignificant violation of Section 99.161 by the candidate would have this effect.
"The Court cannot escape the conclusion that the danger feared by the legislature, and to protect against which this statute was enacted, was the evil influences which might be brought to bear upon the officers in the performance of their official duties by persons contributing to their campaign funds. The possible abuse by operators of race tracks, by liquor dealers and by officers of utilities of the influence acquired upon public officers by contributing to their campaign funds is obvious. The same is true of persons who *614 may have contributed very large sums to elect a candidate. The desire of the legislature to protect the public from these possible evil influences upon their public officers is respected by the Court. But the remedy must be sought within the constitutional powers of the legislature. The disqualification of a candidate who has violated the law in this respect is a very effective way to control this evil. It is not a constitutionally permissible way.
"If the purpose of Section 104.27, Florida Statutes, was to protect the purity of the ballot as distinguished from the purity of the officer to be elected, it most certainly would have provided for voiding the election when the successful candidate had been guilty of bribery, suborning or commiting perjury, intimidation of electors and similar offenses which go directly to the purity of the ballot, and not limiting its scope to those offenses which tend to render the legally elected officer subject to possible corrupt influences.
"For these reasons the Court holds that Section 104.27, Florida Statutes, attempts to add to the constitutional qualifications of candidates for governor and is, to the extent that it purports to authorize the avoidance of the election of a governor, invalid.
"This holding does not in any way affect the criminal responsibility of any person who has violated the statute. If the plaintiff feels that the evidence at his disposal justifies such action, he may present it to the proper prosecuting officer or grand jury.
"The Court has carefully considered the cases cited by counsel for plaintiff holding that the legislature may fix the qualifications of statutory officers  even if elective. But these decisions are not in point here. The Court has also carefully studied the decisions from other states expressing conflicting views on the legislative power to enact stringent election codes and disqualify offending candidates. A detailed discussion of these decisions is not justified in view of the fact that the Supreme Court of Florida, in the case of Thomas v. State, supra, has settled the law in this state.
"It is the conclusion of the Court that in so far as Section 104.27, Florida Statutes, purports to prohibit the occupancy of the office of governor by a person solely because, as a candidate for that office, he violated the provisions of Section 99.161, Florida Statutes, it is in violation of the Constitution of the State and inoperative. No broader adjudication is called for in this case." (Emphasis Supplied)
For the reasons stated the trial court then dismissed the amended complaint.
Having heard argument, we have examined and considered the record and briefs, and I would now adopt the decision of the trial court as the decision of this court.
For the foregoing reasons I have concurred in the per curiam judgment of affirmance.
CALDWELL, C.J., and ADAMS, J., concur.
ERVIN, Justice, concurring in the judgment of affirmance with special opinion:
The Circuit Court opinion adopts the view that Section F.S. 104.27, F.S.A., attempts to add to the constitutional qualifications of candidates for the office of governor and for this reason is invalid to the extent said section purports to authorize the avoidance of the election of a governor. For reasons stated below, I cannot join in the logic or rationale relied on by the Circuit Court in reaching its conclusion. For other stated reasons, however, I concur in our Court's judgment affirming the lower court's dismissal of the complaint here involved.
F.S. Section 104.27, F.S.A. provides in part:
"(1) Any person who knowingly violates the provisions of § 99.161 shall *615 be deemed guilty of a misdemeanor and subject to a fine of not more than one thousand dollars or to imprisonment for not more than six months."
"In addition thereto 
"(2) The nomination or election to office of any person who wilfully violates the provisions of section 99.161, or cause to violate, may be declared void by the court of competent jurisdiction in which event the nomination for office shall be held as in other cases where a vacancy occurs. (Emphasis supplied.)
* * * * * *
"(9) (a) Any elector having information of any violation of § 99.161 may file a petition in any circuit court of this state in the county in which the person or persons violating said § 99.161 resides. * * *
* * * * * *
"(c) The final decree entered by the court in each case shall make a finding of fact that § 99.161 was or was not violated, as the case may be. If the decree of the circuit court finds as a fact that § 99.161 was violated by any nominee or one elected to office, the attorney general shall send a certified copy thereof to the officer responsible for issuing the certificate of nomination or office and upon receipt of such certified copy such officer shall immediately revoke the certificate of nomination or office as may have been issued, or in case such certificate has not been issued he shall withhold the same.
* * * * * *
"(e) Any vacancy in office or nomination on account of any such decree shall not be filled until the expiration of ten days from the date the decree is entered, or if an appeal is taken in time such vacancy shall not be filled until the appeal has been determined by the appellate court and a final decree consequent upon such appeal is entered in the circuit court."
The provisions of Section 99.161 so far as they relate to the present controversy have been adequately summarized by the learned trial judge as follows:
"Section 99.161 relates exclusively to campaign funds of candidates for public office. It forbids certain persons making contributions to candidates. It fixes the maximum that any person may contribute. It requires in great detail the manner and time of receiving, reporting and disbursing these funds. It does not limit or regulate the purpose of expenditures of these funds except that it forbids expenditures for advertising in certain publications; it forbids certain expenditures in behalf of a person before he becomes a candidate; it prohibits a candidate paying for the privilege of speaking at a political meeting and forbids candidates paying for political polls not under their control."
It is readily apparent that the provisions contained in Section 99.161 and the accompanying penalty provisions expressed in Section 104.27 were intended and designed by the Legislature to implement the power and duty vested in it by Section 26, Article III of the State Constitution.[1] It can hardly be contended that the provisions set out in Section 99.161, in and of themselves, have the effect of imposing unconstitutional qualifications on persons seeking an elective office. The compatibility of such statutory election regulations and the constitutionally imposed qualifications relating to a candidate's status to seek or hold public office was implicitly recognized by this Court in State ex rel. Ayres v. Gray (Fla. 1953), 69 So.2d 187. There the Court noted:
"* * * To qualify under this law [Ch. 99, F.S. 1951] as a candidate for *616 Governor, one must take the prescribed oath and an oath of loyalty to the United States and the State of Florida. He must also as a condition precedent to becoming a fully qualified candidate for Governor, appoint a campaign treasurer and designate a campaign depository and file their names and addresses with the Secretary of State. The law carries elaborate provisions regulating the receipt of contributions and the expenditure of funds, and a requirement that detailed reports of these receipts and expenditures be filed weekly with the Secretary of State.
"[3] It is inherent in the law that once a person qualifies for the office of Governor, he may go forth, with the apparent sanction of the State through the Secretary of State, to gather funds to further his candidacy, without any restriction whatever as to the total amount, although there are prohibitions against contributions by persons engaged in certain pursuits, and a limitation on the amount that may be donated by any one individual." (At 189-190.)
Similarly, in Secretary of State v. McGucken, (1966), 244 Md. 70, 222 A.2d 693, the Maryland Secretary of State's refusal to certify a gubernatorial candidate for failure to appoint a campaign treasurer pursuant to the statutory requirements was upheld despite the contention that the statute conflicted with the constitutional requirements pertaining to the eligibility of a person to be governor. The Maryland Court concluded:
"[H]e [candidate] appears to claim that the statute, requiring candidates for office to appoint a campaign treasurer, had the effect of imposing another qualification for the office of Governor in addition to those set forth in the Constitution. We do not agree. On the contrary, it is obvious that the statute, which is part of the Corrupt Practices Act, was intended to do no more than enhance the effectiveness of the regulations requiring a full disclosure of the financial aspects of the campaign of a candidate for office. Clearly the Act, including § 213(a) thereof, has no bearing on the eligibility of a candidate for office." (At 695.)
In the light of the foregoing, it is clear that Section 99.161 does not prescribe who is eligible to seek an elective office in this state, but simply provides that persons seeking such office are obligated to conduct themselves and their campaigns and their financing in a designated manner. No additional comment is needed to reveal the distinction between regulations of Section 99.161 prescribing the necessary way in which campaigns of prospective candidates are required to be conducted and the constitutional requirements governing the status or eligibility of individuals to seek and hold a particular public office.
Despite the fact it is obvious Section 99.161 imposes no sanctions or requirements which measure up to disqualifications attaching to the status of an individual to seek a particular elective office [compare Thomas v. State (Fla. 1952) 58 So.2d 173], the Circuit Court nevertheless views the disabling provisions of Section 104.27 as imposing unconstitutional additions to the qualifications attaching to the office of governor.
I would have no difficulty joining in such reasoning if in fact the remedial provisions of Section 104.27 went beyond merely declaring invalid the nomination or election of a candidate adjudged to have violated the provisions of Section 99.161 with the concomitant result that his certificate of nomination or election be revoked or withheld. More specifically, if Section 104.27 provided that the successful candidate summarily adjudged to have violated Section 99.161 could be barred or prohibited from seeking nomination or election to his espoused office at any subsequent election which presumably would be required in light of the invalidity of the initial election, I could readily understand and appreciate the qualificatory nature of *617 such a sanction.[2] However the remedial provisions of Section 104.27 in no way impose such burdens for the failure to comply with the requirements of Section 99.161.
Although I cannot join with the Circuit Court in reasoning that Section 104.27 imposes unconstitutional qualifications or other additions to the office of governor by attempting to invalidate the election of a candidate adjudged to have violated the provisions of Section 99.161, I do believe that grave constitutional questions are encountered to the extent Section 104.27 purports to provide for a judicial declaration of vacancy in a constitutional office where the holder thereof is, as Appellee, subject to removal by the impeachment process.
The propriety of a judicial decree of ouster of such an incumbent constitutional officer under the provisions of Section 104.27 appears to be a question of first impression in this Court.[3] Viewed in the absence of prior judicial interpretations and clarification, a careful reading of the applicable provisions of Section 104.27 leaves much doubt as to whether the remedy intended by that section extends so far as to embrace an action by an elector to remove or oust a person from office as opposed to merely providing a simple and expedient method designed to prevent the assumption of official duties by a prevailing candidate adjudged to have violated the provisions of Section 99.161. Section 104.27(2) provides that the nomination or election to office may be declared void by a court of competent jurisdiction. Section 104.27(9) (c) provides simply that upon a finding that Section 99.161 was violated, the certificate of nomination or office may be revoked, or withheld if not previously issued. Since such certificate is usually issued upon a proper canvass of the votes and prior to the actual assumption of duties by the officer elected, the revocation of a certificate of nomination or office is not equivalent to an ouster. Similarly the provisions of Section 104.27(9) (e) providing for the filling of a vacancy in office or nomination do not expressly or implicitly embrace the ouster or removal of an officer who has entered upon his duties as opposed to a nominee or officer elect. Also, it should be observed that where the Legislature obviously contemplated an ouster, unambiguous provisions designed to secure that result were employed. See Sections 102.161-102.163, pertaining to ouster in election contests. Since, however, it appears that both Appellant and Appellee herein have proceeded under the theory that Section 104.27 effectively embraces a remedy equivalent to a judicial ouster of an incumbent public officer, I feel obliged to view the merits of this appeal in the context presented.
In In Re Investigation of Circuit Judge, etc. (Fla.1957), 93 So.2d 601, this Court adhered to the view that a constitutional incumbent officer subject to impeachment could only be removed before the expiration of his term in the manner provided by the Constitution. The Court stated:
"The same cases also approve the doctrine that where the constitution *618 creates an office, fixes its terms and provides upon what conditions the incumbent may be removed before the expiration of his term, it is beyond the power of the legislature or any other authority to remove or suspend such officer in any manner than that provided by the constitution." (93 So.2d at 604.)
While I am cognizant that the Court's remarks and holding in the last cited case were directed toward the impropriety of a judicial challenge which indirectly threatened an incumbent officer's authority to retain his office rather than the validity of his entry into office, I am convinced that the mandate of that decision is equally applicable to the present case. Regardless of the niceties of the theories underlying the distinction between a person deemed to be an intruder to the office and one whose conduct while occupying the office subjects him to removal or impeachment, I believe the decision cited above acknowledges the overriding principle that once a person has entered upon the duties of a constitutionally established office, his ouster or removal, or what is equivalent thereto, can only proceed in accordance with the express or implicit prescriptions contained in the Constitution.
While the obvious method for removing an incumbent constitutional officeholder rests with the impeachment and removal provisions of the Constitution, other remedies, judicial in nature, have been employed to effect an ouster of an incumbent officeholder. For example, the law is well settled in this state that the common law writ of quo warranto is available for the purpose of determining the title or right to a public office and to oust an incumbent who has unlawfully usurped or intruded into the office or is unlawfully holding it. See 27 Fla.Jur. Quo Warranto § 171. Similarly, special statutory proceedings may be made available to supplement or otherwise augment the function of quo warranto.[4] However, so far as concerns the efficacy of these remedies to test the title to a constitutionally ordained office or, more particularly, to adjudicate whether there has been an intrusion into such an office, I think it is fundamental that any judgment creating a divestiture of such office must be predicated on the ground that the intruder is not entitled to hold the office by virtue of the direct prohibitions of the constitution. Thus, there is no inherent impediment to adjudicating an ouster of a constitutional officer, so long as the judgment of ouster is grounded on the necessity to preserve constitutional requirements pertaining to his title or qualifications to the particular office.[5] It seems incongruous, however, to countenance a similar remedy as sought in the instant proceedings in the absence of a constitutional mandate authorizing judicial removal or ouster of an incumbent officeholder.
Applying these principles to the present case, I am of the view that so far as Section 26, Article III authorizes the Legislature to regulate the elective process and prescribe penalties to prohibit all undue influence thereon from certain condemned and untoward election campaign practices, such regulatory power is limited to the elective and not to the removal or ouster process because other controlling provisions of the Constitution do not permit this power to extend to and embrace judicial ouster of an incumbent constitutional officeholder. The power vested by Article III, Section 26 is exclusively regulatory in nature and while such power may be essentially *619 plenary so far as permitting the enactment of standards which if adjudged to be violated may result in the invalidity of a given election and preclusion of assumption to a constitutional office, other provisions of the Constitution circumscribe the reach of such power to embrace a remedy equivalent to a judicial ouster of an incumbent. It is one thing to invalidate an election with the attendant result that the successful electoral candidate may be thereby precluded from assuming the duties of the office he sought, but it is quite a different thing to effectively oust an incumbent constitutional officeholder. In other sections of the Election Code the Legislature has tacitly recognized the distinction between precluding a candidate from assuming office and the constitutional nature of the remedy which must be resorted to if the attempt is made to divest or oust a person who has entered upon the performance of the duties of his elected office. Sections 104.071 and 104.271 each suggest that convictions for violations thereof will disqualify a prospective officeholder, but as to an incumbent will only serve as grounds for removal or impeachment. Predicated on the express and implicit commands of the State Constitution, this distinction is likewise applicable to the nature of the remedies sought to be effected by Section 104.27. When, as in the present case, the Constitution creates a particular office and otherwise fixes the terms and conditions under which a person may seek and occupy such office, as well as prescribing the mode and manner by which a person may be divested of his office for conduct inimical to his continued tenure therein, I think the enabling power bestowed on the Legislature pursuant to Article III, Section 26 must be confined to that stage of the elective process where the power and commensurate duties of the office have not vested. To hold otherwise ignores limitations implicit in the Constitution and could well encourage disrupting influences patently out of harmony with the need for stability, continuity and finality in an elective office which underlies the functioning realities of the administration of government. I conclude, therefore, that Section. 104.27, construed in connection with the controlling provisions of the Constitution, cannot provide judicial machinery to divest Appellee of the powers and duties of the office of Governor for conduct proscribed in Section 99.161. Section 29, Article III of the State Constitution provides that constitutional officers of the category in which the Governor is included, shall be removed through the impeachment process exercised by the House of Representatives and the Senate of the Florida Legislature. The divestiture contemplated by this constitutional provision is exclusive except in those few instances where a judicial ouster is appropriate to insure that the title to and qualifications for specific offices are honored. Similarly, incumbent members of the Legislature are not subject to judicial ouster but may be divested of office only by the house to which they are elected. Section 6, Article III, State Constitution.
In entertaining the view as announced above, I am of the opinion that in cases such as the present the impeachment process will provide to some extent a method to test responsibility for conduct incidentally arising as a result of violations of the State's Corrupt Practices Act. The jurisdictional nature of Appellee's amenability to impeachment on charges incidentally connected with alleged pre-election campaign spending violations is not before this Court and nothing said herein is intended to anticipate the proper consideration or determination of such specific question. However, since impeachment is the express method provided by the Constitution for effecting the divestiture of the powers and duties of an incumbent officeholder such as here involved and since it is obvious that removal pursuant to impeachment rather than judicial ouster is the exclusive constitutional means of divestiture, some discussion of the scope of this remedy is necessary in order to focus proper perspective on the view that a judicial ouster is not *620 constitutionally permissible in the present case.
Section 29, Article III of the Constitution imposes impeachment only for "misdemeanor in office." While the scope of "misdemeanor in office" as jurisdictional grounds for impeachment proceedings has received only limited judicial interpretation, the view has emerged that the term is entitled to broader application than the definition associated with the application of common law criminal procedure. As stated by this Court in In re Investigation of Circuit Judge, etc., 93 So.2d 601 (1957):
"* * * Misdemeanor in office as ground for impeachment has a much broader coverage than the common law misdemeanor as usually defined and applied in criminal procedure. As applied to impeachment, `misdemeanor in office' may include any act involving moral turpitude which is contrary to justice, honesty, principles or good morals, if performed by virtue or authority of office. `Misdemeanor in office' is synonymous with misconduct in office and is broad enough to embrace any wilful malfeasance, misfeasance, or nonfeasance in office. * * * In words and Phrases, citing Yoe v. Hoffman, supra, [61 Kan. 265, 59 P. 351,] it was said that the phrase `Misdemeanor In Office,' when referring to impeachment should be applied in the parliamentary sense and when so applied it means misconduct in office. Something which amounts to a breach of the conditions tacitly annexed to the office, and includes any wrongful official act or omission to perform an official duty." (At 605-606.) Emphasis supplied.)
The author of the above cited opinion, the late Mr. Justice Glenn Terrell, further elaborated the scope of the grounds for impeachment under the concept of "misdemeanor in office" in an exhaustive study of the precedents in impeachment proceedings. The article or "brief" by the distinguished Justice appears in Deskbook for Members of The Senate Sitting as A Court of Impeachment (1963), p. 3. In this article Justice Terrell summarized authorities on the subject of impeachment and concluded:
"From this it would hardly seem necessary to say more in support of the thesis that impeachment may lie as well for gross misconduct or abuse of trust as for offenses punishable by statute. As crystallized in the cases, state and federal, the weight of authority is that the abuse of official trust in its many and varied ramifications has been the cardinal vice which formed the pretext, if not the motive, of most of the well considered impeachment trials." (At page 7; emphasis supplied.)
In view of the findings and logic of Justice Terrell, I think it is far from axiomatic that illegal conduct or activities of a prospective holder of the office of Governor prior to his entry upon the performance of his official duties are necessarily beyond the reach of impeachment after assumption of office, particularly where the conduct or activity has an impactual carryover and baneful effect or influence upon the official action or conduct of the officeholder or devolves upon him a positive duty to see that the laws of the State are faithfully executed. For example, if it should appear that such incumbent officeholder has knowingly violated the statutory policy of this state governing the manner and mode of election to office, either singly or in participation with others, and having taken the prescribed oath of office and entered upon the performance of his official duties knowing that said violations have occurred, but fails, and continues to fail, to exercise whatever capacity he may have as a responsible citizen and officeholder to seek the lawful disposition of those violations of which he has knowledge, a breach of public trust may well result sufficient to comport with the necessary grounds for impeachment. Furthermore, Section 99.161, popularly known as the "who gave it, who got it" campaign *621 contribution law, requires reporting and disclosure of amounts contributed to candidates and the sources of the contributions. This duty to report and disclose campaign contributions is a continuing one and does not terminate upon assumption of the elected candidates to office, but continues at least insofar as sanctions or penalties under the Act are concerned until the statute of limitations appertaining to the violation of this duty has run. So long, therefore, as a successful candidate, although having assumed the office he espoused, fails to comply with the provisions of Section 99.161 in its reporting and disclosure aspects, he is in violation of it. When and if he finally reports and discloses a knowing violation of the Act or if his violation otherwise comes to light, it would appear that the violation continues from its discovery during the period of limitations. To the extent therefore that statutory violation in the form of nondisclosure of campaign contributions continues to exist concurrently with the incumbency of an elected officeholder who knowingly has the duty to report them, I see little difficulty in finding the requisite conduct necessary to meet the jurisdictional test of a "misdemeanor in office." In State ex rel. Hardee v. Allen (1937), 126 Fla. 878, 172 So. 222, 225, this Court, in passing on a question involving a comparable consideration, stated:
"* * * His [a state prosecutor's] duty to prosecute violations of the law continues until the offense committed is barred by the statute of limitations, and if he goes out of office that duty devolves on his successor. The holding of this court in the Advisory Opinion to the Governor, supra, relied on by relator, to the effect that one cannot be suspended during his current term for an offense committed in a previous term, has reference to finished offenses known and condoned by election or appointment, but can have no reference to matters arising from the neglect of a continuing duty of an officer during the time in a current term he holds a commission to discharge the duties of the office."
One of the objects of the Corrupt Practices Act is to set up and preserve an official record of campaign contributions in order that a public officer's performance in office may be scrutinized and evaluated by concerned members of the public in the light of what favoritism may causally result from the contributions. F.S. Section 99.183, F.S.A. requires that statements of campaign expenses shall be kept by the officers with whom they are required to be filed "for at least four years." Viewed in this light, the nondisclosure by an elected officeholder is certainly inimical to the policy of the Act and may well constitute a breach of public trust within the contemplation of the impeachment sanction.
More particularly related to the present case, it is noted that Section 99.161 disallows post-election (primary or general) campaign expenditures or contributions. In order to provide fair elections between or among candidates, it is not intended that campaign debts shall be incurred by a candidate unless there are funds in his campaign treasury to pay them. See F.S. Section 99.161(4) (6) F.S.A. Campaign deficits are not contemplated that are to be defrayed by post-election contributions. Although a candidate may borrow money prior to or during the campaign to finance his campaign, his personal funds (whether borrowed or otherwise) spent in the campaign are required to be paid in and disbursed from his campaign treasury. But even if post-election contributions are received to pay off deficits, the candidate should fully report them and disclose their source, similar to ante-election contributions, in order that the spirit and intent of the campaign spending law will not be further violated by nondisclosure.
It may strain credulity to believe an elected officer will admit or plead guilty to a knowing and flagrant violation of the Corrupt Practices Act, and surrender his office. But, theoretically, when such a violation has been committed it is a breach of public trust for the public officer to harbor the guilty knowledge that he *622 won the office unfairly and in violation of the rules of the campaign game and not to take action to requite the public wrong he committed. Failure on his part to take appropriate action to rectify his continuing breach of public trust and misconduct devolves upon the House of Representatives the prerogative to prefer articles of impeachment against him. His failure and neglect of duty to redress his own misconduct constitutes continuing "misdemeanor in office" or breach of public trust.
No doubt it would be more direct, simpler and less complex and expensive if the judiciary were enabled by the Constitution to determine during the incumbency of an elected official whether he is entitled to the office when charged with a violation of Section 99.161, just as it can before he assumes office. However, as the Constitution is now written, divestiture of an incumbent constitutional officer (those contemplated by Section 29, Article III) for violations of the criminal laws involving incidental misconduct or misdemeanor in office is by the impeachment process. No doubt considerations of the need for stability and continuity in offices of high prerogative have dictated throughout past centuries that grave charges of misconduct against incumbents thereof be the subject of impeachment trials at the parliamentary level initially, rather than trials in the courts. Historically, impeachment, with the House of Representatives (or the Commons in England) prosecuting and with the Senate (or Lords in England) sitting as judges instead of the judiciary, has been the traditional process for trying criminal and misconduct charges levelled at high public officials. See Impeachment in Encyclopaedia Britannica.
Nothing is intended by the foregoing views to presume to suggest or recommend to the legislative bodies that Appellee is subject to impeachment because of the incidental or residual effects of alleged violations of Section 99.161. Quite to the contrary, I think the time has passed when the House of Representatives in its regular and special sessions that have come and gone since Appellee assumed office might seasonably in its sound discretion have examined into and considered whether any misdemeanors in office incidental to the alleged election law violations had been committed by Appellee. No good reason appears in this record why the finality and continuity of Appellee's tenure as an elected officer now should be put in question because of the alleged violations in the complaint. However, it would be a weak and sterile disposition of this case to leave the impression that future pre-election violations of the state's Corrupt Practices Act could not be dealt with judicially prior to the incumbency of a constitutional officer in the category enumerated in Section 29, Article III of the State Constitution; or that after his assumption of the office to which he was elected, such officer is in a preferred class and is wholly immune from impeachment on charges arising as incidental concomitants to violations of the Act. Also it would be anomalous to leave the impression that a gubernatorial candidate is not subject to the Corrupt Practices Act while all other candidates for public office are.
For the reasons stated above, I concur in the judgment of the Circuit Court that it lacks authority to grant the relief sought and that the complaint should be dismissed.
DREW, Justice (dissenting):
The appeal before the Court is from an order dismissing a complaint which invoked the specific provision of F.S. Sec. 104.27, F.S.A., that the "election to office of any person who wilfully violates the provisions of section 99.161, or cause to violate, may be declared void * * *." (e.s.) Motion to dismiss filed by the defendant Governor Claude Kirk asserted that the statute could not constitutionally be applied to the office of Governor. The trial court held that the quoted statute could not in this case be sustained as an exercise of the legislative power to regulate *623 elections[1] because the conduct penalized "is not reasonably calculated to have unduly and improperly influenced the voting to such an extent as to prevent the election being a true expression of the popular will. * * *," and that it therefore constitutes an attempt to impose an additional eligibility requirement for a constitutional officer in conflict with Art. IV, Sec. 3 and Art. VI, Sec. 5, Fla. Const.,[2] as construed in Thomas v. State, Fla. 1952, 58 So.2d 173. The opinion in the Thomas case, holding that the Legislature could not require of a constitutional officer any qualifications different from those stated in the Constitution, does not involve in any way the validity or enforcement of election regulations and does not, so far as I can see, directly or indirectly support the invalidation of the present statute.
This reasoning, in my opinion, fails to make the elemental distinction between the fact of eligibility, which the Constitution defines, and the fact of a valid election, which is left to legislative definition and regulation under the constitutional mandate that the laws shall preserve the purity of the ballot in the elective process and shall prohibit "under adequate penalties all undue influence thereon from power * * * or other improper practices."[3] The Constitution states who may be elected and by what electors, but leaves to legislative control the matter of what acts or practices may prevent an election. Certainly the provision for "adequate" penalties is not in terms or by implication limited to criminal penalties.
We are confronted with a decision that constitutional officers may not be held answerable for acts legislatively defined as corrupt practice in the election process, in a proceeding to determine the validity of their election under a statute which our courts have in an earlier case applied to declare void the election of a lesser public officer (affirmed on appeal by the district court).[4] The charges of wilful violation of Sec. 99.161 in the present case include, among the 36 infractions detailed in the *624 complaint, such matters as excessive and unreported campaign contributions and acceptance of funds from prohibited contributors, all of which in the present posture of the case must be regarded as admitted by respondent to be true.
I am unable to find that the constitutional prescription of an officer's qualifications prevents exercise of the clear legislative authority under the other organic provisions cited, or to agree to what amounts to a judicial negation of the legislative determination of what is reasonably calculated to improperly influence voting. The decisions from other states upon which respondent relies do not in any instance provide direct support for respondent here. Many of the opinions to which we are referred, including that of this Court in Thomas v. State, supra, deal with statutes wholly unrelated to ballot purity.[5] In the case of Bradley v. Clarke,[6] cited in support of the decree, the court held invalid a statute imposing an oath, but stated:
"* * * in holding that the legislature may not prescribe this additional oath upon a successful candidate, as a prerequisite to this right to take office, and as an additional qualification to those enunciated by the constitution, we do not mean to be understood as saying that the legislature may not with propriety provide that a candidate shall forfeit his office for the doing of any of the inhibited acts, or for the failure to do any of the required acts set forth in the purity of election law. The legislature would have the undoubted power to require an officer elect to file just such a statement as the law now prescribes, and to provide that for a failure so to do he should forfeit his office or his right to office; but, under the strict mandate of the constitution, it has no right to exact this different and additional oath or affirmation before the taking of office, as a prerequisite thereto." (e.s.)
Well reasoned precedent, on the other hand, has sustained comparable legislation under a constitution which, like our own, prescribed certain qualifications for the office in question:
"There would seem to be little doubt that the clear legislative purpose was to declare that a violation of the act by a candidate should render his election void. It is difficult to read anything else out of it. If the election is void and the candidate has intruded into the office, it is clear that he had no right thereto, and a judgment of ouster excluding him from the office and declaring it vacant is merely a summary and expeditious method of removing him therefrom. He does not by misconduct forfeit an office once lawfully acquired. He never secures title to it. It does not shorten his term, because he was never elected. It terminates the term of his intrusion into the office. * * *
"* * * It is a well-established principle of constitutional law that, where qualifications are prescribed by the Constitution and the methods of removal are provided by the Constitution, the Constitution in those respects is exclusive, and it is beyond the power of the Legislature to prescribe additional qualifications, or to provide for removal of other than the constitutional method. Quite obviously the statute here under consideration was framed with due regard *625 to these fundamental principles, and so it is provided that violation of the statute by one who receives the plurality of votes prevents an election. A candidate under such circumstances gains no title through such a proceeding even though, as was pointed out in the Markham Case, he secures a certificate of election. When the fact that a candidate has violated the statute becomes established in the manner provided by the statute, the certificate is manifestly of no effect because there was no election. The certificate of election is not a title, it is a mere muniment of title, evidence of title. What the statute in effect does is to create a conclusive presumption that a violation of the statute chargeable to the person receiving the highest number of votes renders his election void, because the result was achieved by practices declared by the statute to be corrupt and illegal. We are cited to no cases, and we find none, holding that it is not competent for the Legislature to enact such a law. * * *" State ex rel. La Follette v. Kohler, 200 Wis. 518, 228 N.W. 895, 907, 69 A.L.R. 348, 366.
I am in complete accord with these views of the highest court of Wisconsin.
The Legislature clearly intended  and in my opinion the people gave it the power to prescribe  that the wilful violation of the laws designed to protect the purity of the ballot and provide for the free and full expression of the choice of the people would result in a forfeiture of the right to hold the office obtained by means of such violations. Any penalty less severe would be inadequate.
Those who voted in this election had a right to assume that their candidate had obeyed the sovereign laws of this State with respect to these matters. Periodically during the campaign lists of contributors were published by the candidate to establish that such was the case. How can it now be said that had these electors known these facts, they would have cast their votes as they did? And, how can it now be said that under this state of facts such failure to disclose  and the violation of these statutes  [as the trial court has said] was "not reasonably calculated to have unduly and improperly influenced the voting to such an extent as to prevent the election being a true expression of the popular will. * * *" That conclusion is the keystone in the arch supporting the decision of the trial court which this Court now affirms.
It has been suggested in the opinion by Mr. Justice Ervin concurring in the judgment of affirmance that impeachment might be resorted to where a constitutional officer subject to impeachment has been guilty of a violation of the election laws designed to ensure the purity of the ballot. The simpler answer to this is that under the Constitution of this State the Governor may be impeached "for any misdemeanor in office."[7] This Court has repeatedly held, as have the courts generally in this country, that acts subjecting an officer to impeachment must be acts committed during the term of his office.[8] Such is not the case here.
*626 The clouds of suspicion created by these charges against the "chief magistrate of this State" in whom is "vested the supreme executive power" and whose responsibility it is to "take care that the laws be faithfully executed" should not be permitted to continue to hover over the capital. The Governor should be exonerated and these clouds dispelled or, if the charges be adjudged to be true, the election should, as the statute says, "be declared void." In no other way can these salutary statutes be effectively enforced and these laws be made to apply to all men alike.
I would reverse this case and send it back for a trial on the merits.
THORNAL, J., concurs.
NOTES
[1] Eligibility of governor.  No person shall be eligible to the office of Governor who is not a qualified elector, and who has not been ten years a citizen of the United States, and five years a citizen and resident of the State of Florida, next preceding the time of his election; Provided, that these limitations of time shall not apply to the President of the Senate or Speaker of the House of Representatives when, under this Constitution, the powers and duties of Governor shall devolve upon them.
[2] Power to exclude criminals from holding office and right to vote.  The Legislature shall have power to, and shall, enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny or of infamus crime, or who shall make, or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter fight a duel or send or accept a challenge to fight, or that shall be second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law.
[3] These persons are here referred to because it is they who are prohibited by the letter of Section 99.161 from contributing to campaign funds.
[4] Constitution 1838, Section 3, Article VI.
[5] Constitution 1838, Section 10, Article VI.
[1] Sec. 26, Art. III of the Constitution provides: "Laws shall be passed regulating elections, and prohibiting under adequate penalties, all undue influence thereon from power, bribery, tumult or other improper practice."
[2] In this respect it is interesting to compare §§ 104.071 and 104.271 of the Election Code with the penalty provisions of § 104.27. Sections 104.071 and 104.271 each provide that any candidate found guilty of violating the provisions contained therein shall be punished for a misdemeanor and from and after his conviction shall be disqualified to hold the office or position to which he aspires for the term affected. It would appear that the penalty provisions of these sections, unlike those of § 104.27, truly affect a candidate's qualifications to hold office and could well collide with the rule announced by the Circuit Court herein. Of course, it may be that such penalties are constitutionally permissible by virtue of § 5, Art. VI of the Constitution.
[3] In Evans v. Carroll, 104 So.2d 375 (Fla. 1958), disposed of on the basis of inadequacy of jurisdictional grounds, this Court specifically noted that it was not considering the propriety of adjudicating an ouster in a proceeding brought under § 104.27.
[4] See F.S. §§ 161.161-161.163, F.S.A., for an example of special statutory machinery designed to supplement quo warranto proceedings in the area of election contests.
[5] Sec. 2, Art. IV of the Constitution provides that the governor shall be elected by the qualified electors of the state. Sec. 3, Art. IV fixes the qualifications of the governor. Sec. 5, Art. VI specifies certain general disqualifications prohibiting the holding of public office. Violations of these constitutional requirements providing for election by the people and the qualifications of the governor, have traditionally been the subject of judicial ouster proceedings.
[1] * * Section 9, Article VI directs that `The legislature shall enact such laws as will preserve the purity of the ballot.' Section 26, Article III, is as follows: `Laws shall be passed regulating elections, and prohibiting under adequate penalties, all undue influence thereon from power, bribery, tumult or other improper practices.'"
[2] Eligibility of governor.  No person shall be eligible to the office of Governor who is not a qualified elector, and who has not been ten years a citizen of the United States, and five years a citizen and resident of the State of Florida, next preceding the time of his election; Provided, that these limitations of time shall not apply to the President of the Senate or Speaker of the House of Representatives when, under this Constitution, the powers and duties of Governor shall devolve upon them.
"2 Power to exclude criminals from holding office and right to vote.  The Legislature shall have power to, and shall, enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny or of infamus crime, or who shall make, or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter fight a duel or send or accept a challenge to fight, or that shall be second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law."
[3] Note 1, supra. In 1957 a decree of the eminent chancellor below, which was, as in this case, quoted and affirmed by this Court, said with reference to these statutes relating to the purity of the ballot:

"The Legislature is charged with the duty of enacting statutes prohibiting all undue influence upon elections from power, bribery, tumult or other improper practices. Section 26, Article III, Florida Constitution, F.S.A. The statute under consideration was obviously enacted for the purpose of carrying out this constitutional duty." (e.s.) Ervin v. Capital Weekly Post, Fla. 1957, 97 So.2d 464, 469.
[4] Evans v. Carroll, Fla. 1958, 104 So.2d 37, 108 So.2d 782.
[5] Buckingham v. State (1944), 3 Terry 405, 42 Del. 405, 35 A.2d 903; Mississippi County v. Green (1940), 200 Ark. 204, 138 S.W.2d 377; People ex rel. Hoyne v. McCormick (1913), 261 Ill. 413, 103 N.E. 1053, Ann.Cas. 1915A, 338; Campbell v. Hunt (1917), 18 Ariz. 442, 162 P. 882. One case involves constitutional language providing specifically that a gubernatorial election could be voided for bribery, which was construed as limiting such grounds to those specified and preventing for that reason a broader legislative act. Kilday v. State (Tex.Civ.App. 1934), 75 S.W.2d 148.
[6] 133 Cal. 196, 65 P. 395, 396.
[7] Sec. 29, Art. III, Fla. Const.
[8] For a full discussion of this proposition see the brief of the late Mr. Chief Justice Glenn Terrell and the Journal of the Senate acting as a Court of Impeachment against Honorable George E. Holt, Circuit Judge, beginning p. 519; the appendix to the Journal of the Senate acting as a Court of Impeachment against Circuit Judge Richard Kelly, beginning p. 405; the Senator's Desk Book. Also see Tipton v. Sands. 103 Mont. 1, 60 P.2d 662, 106 A.L.R. 474, where it is said:

"* * * It will be observed that the above provision applies to the removal of the officers indicated therein for high crimes and misdemeanors, or malfeasance in office, while the proceeding involved herein is to determine the validity of contestee's election; if he is guilty of a corrupt practice his election is void and he holds no office and never did." 103 Mont. 9, 60 P.2d p. 666, 106 A.L.R. p. 480.